IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

UNITED STATES OF AMERICA

v.   CRIMINAL ACTION NO. : 1:25-cr-00063-GHD-DAS

WILSON JONES
EDWARD LEE CHILDRESS   DEFENDANTS

DEFENDANT'S MEMORANDUM OF AUTHORITIES
IN SUPPORT OF HIS MOTION TO SEVER

Defendant Edward Lee Childress ("Childress"), by and through counsel, files his Memorandum of Authorities in Support of his Motion to Sever pursuant to Rule 14 of the Criminal Rules of Procedure. Childress respectfully requests that the Court sever his trial from the trial of his co-Defendant, Wilson Jones ("Jones") because a joint trial will be substantially and improperly prejudicial.[1] In support of, Childress shows as follows:

## INTRODUCTION

The government indicted Jones for possessing child pornography and producing a visual depiction of a minor engaging in sexually explicit conduct. *See* [ECF No. 20]. In the same indictment, the government charged Childress with misprision of a felony for failing to report Jones to law enforcement for committing the aforementioned crimes. *Id*. Specifically, the government alleges that Childress knew, but did not report to law enforcement, that Jones possessed and produced ***five*** (5) virtual reels that qualified as child pornography and/or a visual depiction of a minor engaging in sexually explicit conduct, *i.e.*, child sexual abuse material ("CSAM"). However, the government's investigation uncovered ***thousands*** of additional CSAM

---

[1] Should Childress's Motion to Sever become moot if Jones changes his plea from not guilty to guilty, the Defendant reserves the right to move to exclude the additional images of child sexual abuse material that Jones had on his school laptop for which Childress was unaware.

1

that Jones possessed and/or produced for which there is no allegation or evidence that Childress had any knowledge of. The government's introduction of the additional CSAM in its case and chief against Jones will substantially and improperly prejudice Childress, necessitating severing the trial of the two co-defendants.

## FACTUAL BACKGROUND

On November 19, 2024, Jones – a teacher at Corinth Middle School – used an artificial intelligence ("AI") program to create sexually explicit computer generated images that superimposed the actual faces of CSD students onto virtual/fake bodies.[2] Jones then used an AI program to create five (5) reels wherein he instructed the computer generated images to kiss each other and lift their dresses to reveal fake "garmentless" bodies, *i.e.*, images that were clearly not the body of an actual child. Upon learning of Jones's misconduct, Childress – then Superintendent of CSD[3] – immediately contacted the CSD Board Attorney regarding the AI incident. The CSD Board Attorney reviewed the AI reels and advised Childress that Jones had *not* committed a crime and that CSD should *not* report Jones to law enforcement. Instead, the CSD Board Attorney advised Childress to report Jones to the Mississippi Department of Education ("MDE") for violating the Mississippi Code of Ethics and Standards of Conduct – which Childress did.

Based on information learned from Childress's Infraction Report on Jones, the MDE reported Jones to the Corinth Police Department. *See* [ECF No. 39-4]. Importantly, two days before the MDE reported Jones to the Corinth Police Department, the Attorney General's Office: (1) informed the CSD Board Attorney and Childress that CSD had satisfied its reporting obligations when it reported Jones to the MDE; (2) confirmed that MDE would report Jones to

---

[2] Jones procured images of Corinth School District ("CSD") students via their personal social media accounts.
[3] On March 17, 2025, the CSD Board of Trustees voted to terminate Dr. Childress' employment.

2

Corinth Police Department; and (3) made clear that CSD had no obligation to make a separate report to law enforcement. *See* [ECF No. 39-3].

After learning of the Jones AI incident, law enforcement opened an investigation into Jones and seized Jones's school computer. Childress had preserved Jones's school computer. During its investigation, law enforcement uncovered ***thousands*** of images of CSAM that Jones had stored on his laptop. Again, there is no evidence or allegation that Childress or any other person at CSD was aware of the additional CSAM.

## PROCEDURAL POSTURE

On May 29, 2025, the government filed a three-count indictment against Jones and Childress. Jones is the subject of Counts One and Two, which charge:

**Count One:** On or about November 19, 2024, in the Northern District of Mississippi, WILSON JONES, defendant, did knowingly possess any child pornography, as defined in Title 18, United States Code, Section 2256(8)(C), which had been shipped and transported using any means and facility of interstate and foreign commerce, and which was produced using materials which have been mailed, shipped, and transported in and affecting interstate and foreign commerce, by any means, including by computer, in violation of Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2); and

**Count Two:** On or about November 19, 2024, in the Northern District of Mississippi, WILSON JONES, defendant, did knowingly produce and receive a visual depiction of any kind, including a drawing, cartoon, sculpture, and painting that depicts a minor engaging in sexually explicit conduct, and did attempt to do so, and is obscene, and any visual depiction involved in the offense had been shipped and transported in interstate and foreign commerce by any means, including by computer, and was produced using materials that had been shipped and transported in interstate and foreign commerce by any means, including by computer, in violation of Title 18, United States Code, Section 1466A(a)(1) and (d)(4).

3

[ECF No. 20]. Simply put, the indictment charges Jones with: (1) possession of child pornography; and (2) producing an obscene visual depiction of a minor engaging in sexually explicit conduct (hereafter, collectively referred to as "CSAM Charges").

Childress is the subject of Count Three, which charges:

**Count Three:** On or about November 20, 2024 through on or about January 29, 2025, in the Northern District of Mississippi, EDWARD CHILDRESS, defendant, having knowledge of the actual commission of a felony cognizable by a court of the United States, to wit, the possession of material constituting child pornography and the production of an obscene visual depiction of a minor engaging in sexually explicit conduct, did conceal the same by permitting WILSON JONES to resign his position as a teacher at the Corinth School District, and misrepresenting to the Corinth School Board the reason for WILSON JONES's resignation from his position as a teacher at the Corinth School District, and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, in violation of Title 18, United States Code, Section 4.

[ECF No. 20]. The indictment charges Childress with violating 18 U.S.C. § 4, *i.e.*, misprision of a felony. The elements for misprision of a felony are: "(1) the defendant had knowledge that a felony was committed; (2) the defendant failed to notify authorities of the felony; and (3) the defendant took an affirmative step to conceal the felony." *U.S. v. Adams*, 961 F.2d 505, 508 (5th Cir. 1992). "The mere failure to report a felony is not sufficient to constitute a violation of 18 U.S.C. § 4." *U.S. v. Johnson*, 546 F.2d 1225, 1227 (5th Cir. 1997). Notably, "it has long been recognized by the courts that misprision of felony is a criminal offense separate and distinct from the specific felony concealed." *Londono-Gomez v. I.N.S.*, 699 F.2d 475, 476 (9th Cir. 1983); *see also Patel v. Mukasey*, 526 F.3d 800, 803 (5th Cir. 2008) ("the federal misprision of a felony statute defines a *separate* offense, distinct from the underlying felony.")

As discussed above, after Childress reported Jones to the MDE for the five (5) AI reels, the government discovered thousands of additional images of CSAM on Jones's laptop. It is the

4

undersigned's understanding that, in its case and chief against Jones, the government intends to introduce evidence of the five (5) AI reels *as well as* the thousands of additional CSAM images. There is no allegation or evidence that Childress concealed the thousands of additional images of CSAM found on Jones's laptop. In fact, of the voluminous amount of evidence against Jones – the government contends that Childress was only aware of the existence of five (5) AI reels. The indictment alleges that Childress concealed Jones's crimes by taking the following two affirmative steps: (1) allowing Jones to resign; and (2) misrepresenting the CSD School Board the reason for Jones's resignation.

## **LEGAL AUTHORITY**

A "trial court may grant a severance if it appears that the defendants will be prejudiced by a joint trial." *U.S. v. Erwin*, 793 F.2d 656, 665 (5th Cir. 1986) (citing Fed. R. Crim. P. 14(a)). Under Rule 14, severance is proper only if there is a serious risk that a joint trial would: (1) "compromise a specific trial right of one of the defendants"; or (2) "prevent the jury from making a reliable judgment about guilt or innocence." *U.S. v. McRae*, 702 F.3d 806, 822 (5th Cir. 2012). "Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Zafiro v. U.S.*, 506 U.S. 534, 539 (1993). Further, when defendants are "tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." *Id*. In cases where "there is a gross disparity in the quantity and venality of the testimony against the respective joint defendants it is fair to inquire 'whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and limited admissibility.'" *U.S. v. Sampol*, 636 F.2d 621, 647 (D.C. Cir. 1980) (quoting *U.S. v. Gaines*, 563 F.2d 1352, 1355 (9th Cir. 1977)).

When considering a motion to sever, a "court must weigh any prejudice the defendants might suffer against the government's interest in the judicial economy of a joint trial." *U.S. v. Erwin*, 793 F.2d 656, 665 (5th Cir. 1986). A court "should also consider whether some defendants may be unduly prejudiced by harmful 'spill-over' of evidence against other defendants." *Id*. "The 'dangers [for] transference of guilt' are such that a court should use 'every safeguard to individualize each defendant in his relation to the mass[.]'" *Sampol*, 636 F.2d at 645 (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 773 (1946)). "Particularly where there is a great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that guilt will improperly 'rub off' on the others." *U.S. v. Mardian*, 546 F.2d 973, 977 (D.C. Cir. 1976). As such, courts have required severance "when the evidence against one or more of the defendants is 'far more damaging' than evidence against the party seeking severance." *Sampol*, 636 F.2d at 645. "[N]ot only the weight of the evidence, but also the quantity and type of evidence adduced against the co-defendants, is a vital consideration in evaluating the necessity for severance." *Id*.

In *Sampol*, the government indicted eight defendants arising out of the assassination of Orlando Letelier, former Chilean Ambassador to the United States, and Ronni Moffitt, an American associate, via the remote control detonation of a bomb attached to the undercarriage of a vehicle. *See* 636 F.2d at 629. Seven defendants were charged with conspiracy to murder a foreign official, with murder of a foreign official, with first degree murder of Letelier, with first degree murder of Moffitt, with murder by use of explosives to blow up a vehicle engaged in interstate commerce. *Id*. The eighth defendant, Ignacio Novo Sampol ("Sampol"), was not alleged to have been a member of the conspiracy to murder the Ambassador, nor to have participated in the murders in any way. *Id*. at 642. However, Sampol had varied personal connections with the conspirators (one of whom was his brother) and, after the murder was accomplished, a conspirator

6

confessed to Sampol what they had done. *See Sampol*, 636 F.2d at 655–56. Thereafter, Sampol lied to an FBI agent and denied having knowledge of the bombing and also made false statements to the grand jury concerning his knowledge of the assassination. *Id*. The government indicted Sampol with two counts of false declarations to the grand jury and one count of misprision of a felony. *Id*. at 629.

Sampol filed a motion to sever, which the trial court denied. Sampol was tried with co-defendants Guillermo Novo (his brother) and Alvin Ross Diaz – both of whom were on trial for murder and other substantive counts related thereto. The D.C. Circuit overturned Sampol's conviction, noting that the "***amount and provocative nature*** of the evidence required to prove the charges against his co-defendants so exceeded and varied from that which was necessary or relevant to the charges against [Sampol] that it was unfair to him, and unrealistic to expect a jury not to be influenced by such extraneous testimony in its assessment of his guilt upon the lesser charges for which he was tried." *Id*. at 647 (emphasis added).

In *U.S. v. Cortinas*, the Fifth Circuit, applying similar reasoning to the *Sampol* court, held that the trial of two appellants should have been severed from the trial of their seven co-defendants – despite the fact that all defendants were indicted as members of the same drug conspiracy. *See* 142 F.3d 242, 248 (5th Cir. 1998). The two appellants had withdrawn from the drug conspiracy *before* their co-defendants employed the violent Bandido National Motorcycle Club ("Bandido") to collect debts from the conspiracy's drug customers. *Id.* The two appellants argued that they "were prejudiced by the testimony of the Bandido's tactics and activities, including the highly inflammatory evidence" that the Bandidos had shot up a house, killing a 14-year-old boy, as a part of the Bandido's debt collection practices on behalf of the conspiracy. *Id.* The Fifth Circuit agreed that the "motions for severance should have been granted," noting that neither appellant "was

7

associated with the Bandidos" and that the record reflected "that their charged involvement [with the conspiracy] ended in 1989, prior to the Bandido's joining the conspiracy." *Cortinas*, 142 F.3d at 248. As such, the Fifth Circuit held that the trial court abused its discretion by not severing the trial of two co-defendants, noting: "***Limiting instructions*** given by the trial judge ***were inadequate to mitigate the prejudicial effect*** of the overwhelming testimony regarding the violent, criminal activities of the Bandidos." *Id.* (emphasis added). The Fifth Circuit determined the evidence was so inflammatory and prejudicial that it severed the trials of ***co-conspirators*** charged with participating in the same drug conspiracy.

In *Erwin*, the Fifth Circuit "reversed the conviction of an appellant [Grace Davis] whose perjury charges were only ***peripherally related*** to a drug and racketeering conspiracy." *McRae*, 702 F.3d at 823 (emphasis added) (citing *U.S. v. Erwin*, 793 F.2d 656 (5th Cir. 1986)). Davis was the lone defendant who the government did not charge with participating in the drug and racketeering conspiracy; however, her "perjury charges stem[med] from an investigation into profits from that conspiracy[.]" *Erwin*, 793 F.2d at 665. Davis argued, and the Fifth Circuit agreed, that evidence of the larger drug and racketeering conspiracy "differed qualitatively" from Davis's perjury charge and "poisoned the jury's minds against [Davis.]" *Id.* at 665. Ultimately, the Fifth Circuit reversed Davis's conviction because "very little of the 'mountainous evidence,' including evidence of two kidnappings, two beatings, and one killing, 'was usable against [the appellant], and almost none of it applied directly.'" *McRae*, 702 F.3d at 823 (quoting *Erwin*, 793 F.2d at 666). Thus, the Fifth Circuit determined that "the prejudice from the joint trial 'far outweighed' any benefit of judicial economy." *McRae*, 702 F.3d at 823 (quoting *Erwin*, 793 F.2d at 666). Moreover, fact that the trial "court frequently cautioned the jury – before, during and after the trial – about the proper use of the evidence" did not persuade the Fifth Circuit that the jury "could reasonably

8

separate the evidence and render impartial verdicts as to each defendant." *Erwin*, 793 F.2d at 665–66.

Likewise, in *McRae*, the Fifth Circuit vacated the conviction of appellant David Warren ("Warren") because his charge "***was only tangentially relevant***" to the charges against his two co-defendants Gregory McRae ("McRae") and Travis McCabe ("McCabe"). *See* 702 F.3d at 823. The *McRae* case dealt with the "horrific failure of law enforcement" in the immediate aftermath of Hurricane Katrina. In the district court, "three former [New Orleans] policemen were convicted in the same trial… largely on separate facts but all arising from the death of one citizen, Henry Glover." *Id.* at 810.

While on duty, Warren shot Henry Glover ("Glover") – who he thought to be a possibly armed looter – with his personal rifle. *Id*. at 822. When Glover was shot, he was with William Tanner ("Tanner"), Bernard Calloway ("Calloway"), and his brother, Edward King ("King"). Immediately thereafter, Tanner, Calloway, and King put Glover in Tanner's vehicle and drove him to the nearby Habans Elementary School where the New Orleans Police Department ("NOPD") had set up a temporary base. *Id*. at 813. The three men "were not so warmly greeted by a swarm of police officers and impolitely ordered at gunpoint to exit the car." *Id.* at 817. Notably, Tanner and King testified that the NOPD officers physically assaulted them and directed degrading racial slurs towards the three men. *Id*. at 817 n. 6. After Tanner, King, and Calloway were "subdued", co-Defendant McRae took Tanner's car, with Glover's body still inside, and drove it over the levee, down a ramp and into a group of trees where he then set the vehicle on fire. *Id.* at 817–18. Later, co-Defendant McCabe allegedly removed the original police report addressing Glover's shooting, which was unfavorable to Warren, and replaced it with a fraudulent second report that

9

tended to exonerated Warren in the Glover shooting. *McRae*, 702 F.3d at 818–19. Notably, there was no allegation that Warren was involved in co-Defendant McCabe's coverup of the shooting.

Warren, McCabe, and McCrae were tried together. The Fifth Circuit vacated Warren's conviction because he was prejudiced by the joint trial, noting: "the charge against Warren – that he acted unlawfully in shooting Glover – was only tangentially relevant to McRae's alleged ghoulish crime of obstruction related to Glover and the alleged cover-up charged against McCabe." *Id*. at 823. The *McRae* opinion identified three factors that convinced the Fifth Circuit that the district court abused its discretion:

*First*, "the marginal relationship between the charge and the evidence against Warren and that against his co-defendants[.]" *Id*. at 828. The Fifth Circuit noted that the Warren's two co-defendants "could have been convicted even if Warren had been found innocent[.]" *Id*. at 823. Further, "very little of the evidence of the alleged cover-ups was properly usable against Warren, and… almost none of it applied directly to him." *Id*. Yet, "notwithstanding that *no* conspiracy was charged among the defendants, [the Fifth Circuit's] review of the record strongly suggest[ed] that the government was attempting to try the cases against each defendant as a whole piece, in effect a conspiracy, involving each of the defendants in a grand scheme… to engage in criminal conduct to protect Warren for his role in [the victim's] shooting." *Id*. at 826. In fact, "[v]oluminous evidence and testimony was presented which, **as a result of the joint trial**, suggested that McCabe was in a conspiracy with Warren to exonerate Warren" for his unlawful shooting of Glover. *Id*.

*Second*, "the significant difference between the simpleness of the underlying charges – essentially use of excessive force – against Warren, in the performance of his duty as a police officer, and the crimes alleged against his co-defendants involving dishonesty, corruption, obstruction and cover-up[.]" *Id.* at 828. The Fifth Circuit distinguished the *McRae* case from cases

10

where severance is not warranted because "the difference between the types of crimes charged, on the one hand, and the related evidence, on the other, was not so great." *McRae*, 702 F.3d at 828. In other words, there was too great of a difference between the type of charge against Warren and the evidence required to show that Warren used excessive force as a police officer compared to the type of charges and evidence required to convict Warren's co-defendants.

*Third*, "the highly inflammatory and prejudicial nature of the charges and evidence against the co-defendants, from which [appellant] was disassociated[.]" *Id.* As the Fifth Circuit explained, the appellant "was not charged with the alleged obstruction and cover-up crimes, but still he was required to sit before the jury while the emotion-charged testimony was unveiled to the jury and to hear his name bandied around the fringes of those offenses as part of the 'Fourth District Fraternity' intent on protecting one of its own." *Id*. at 823.

## ARGUMENT

The instant case involves the same concerns that the Fifth Circuit faced in *Cortinas, Erwin,* and *McRae* and the D.C. Circuit faced in *Sampol*. Like the appellate courts concluded in those cases, a joint trial will substantially prejudice Childress and, as such, severance is appropriate.

I. <u>The Charge Against Childress is Only Peripherally Related and Tangentially Relevant to the Charges Against Jones</u>

In *Erwin* and *McCrae*, the Fifth Circuit determined that the respective perjury and obstruction charges were not closely related to the crimes charged against the co-defendants. This is true even though the obstruction and perjury charges were directly tied to the charges against the co-defendants. For example, in *Erwin*, the defendant was indicted for perjury before the grand jury that was investigating her co-defendant's income tax liability related to the co-defendant's "profits from th[e] conspiracy" to distribute cocaine. *See* 793 F.2d at 665. Similarly, in *McRae*, the defendant's charge of unlawfully shooting the victim was not closely related to the obstruction

11

charges against his co-defendants for the subsequent disposal of the victim's body and falsification of the police report describing the victim's shooting. *See McRae*, 702 F.3d at 823.

Here, Childress is charged with misprision of a felony for allegedly concealing Jones's crimes from law enforcement. The misprision charge against Childress is only peripherally related and tangentially relevant to the CSAM charges against Jones. The fact that Childress's charge is connected to Jones's does not make them substantially relevant to each other. Instead, as in *Erwin* and *McRae*, Childress's charge is only tangentially relevant to Jones's charges. For example, Jones can be convicted regardless of whether Childress is acquitted or convicted. Further, the mountain of evidence against Jones is not admissible against Childress, *i.e.*, the thousands of CSAM images that Childress was unaware of. Finally, there is a great possibility that the jury will be confused and/or misled and assume that Childress was involved in a conspiracy with Jones because he did not immediately report Jones to law enforcement. There is no allegation of a conspiracy, and no such charge is included in the indictment.

There is only a marginal relationship between the charge and evidence against Childress and the charges and evidence against Jones. This supports severance.

II. <u>There is a Significant Difference in the Type of Crime Charged Against Childress Compared to the Crimes Charged Against Jones</u>

Childress's misprision of a felony charge is significantly different than Jones's child pornography and production of a visual depiction of a minor engaging in sexually explicit conduct. Evidence of thousands of images of CSAM that will be introduced against Jones is qualitatively different than the evidence that Childress knew about Jones's creation of the five (5) AI reels. There is too great of a difference between Childress's charge of misprision of a felony and the evidence to prove the same compared to Jones's charges and the evidence used to prove those. This creates a significant concern that the evidence against Jones will "spillover" into the case

against Childress. Or, in other words, that the jury will not be able to separate the two defendants such that evidence regarding the guilt of Jones will "rub off" onto Childress and the jury's mind will be poisoned towards Childress. This supports severance.

> III. *The Evidence Against Jones is Highly Inflammatory, Prejudicial, and Would Not be Admissible in a Trial Against Childress as the Sole Defendant*

The undersigned understands that Jones's CSAM images are not restricted to computer generated bodies of children, but that there are some CSAM images that are not computer generated in any way. In other words, there are child pornography images that are of the actual bodies of children – a fact which is not present in the case against Childress. Further, the undersigned understands that the additional CSAM images are significantly more explicit than the five (5) AI reels Childress was aware of when he sent the termination letter to Jones. For example, the five (5) AI reels did not contain any depictions of genitalia or bare breasts; however, this is not the case for the additional CSAM images found on Jones's school laptop.

None of the evidence of the additional CSAM images would be admissible against Childress if he were the only defendant. Yet, Childress will be required to sit before the jury while the emotion-charged testimony about graphic child pornography is unveiled to the jury. His name will be associated with Jones's possession of the additional CSAM images and, in light of the highly inflammatory nature of the testimony, there is a great concern that the jury will not be able to reasonably separate the evidence and render impartial verdicts as to each defendant.

Moreover, limiting instructions by the Court will not be able to mitigate the prejudice of a joint trial wherein the jury will learn of the thousands of images of CSAM that Childress had no knowledge of. It is highly probable that the jury will make a judgment on the fact that Childress, as superintendent of CSD, did not discover the additional CSAM images on Jones's school laptop; however, that is not what Childress is on trial for. The jury should not be allowed to be confused

or misled by evidence of other CSAM images on Jones's school laptop – which has no pertinence to Childress's charge of misprision of a felony. This supports severance.

## **CONCLUSION**

For the reasons stated above, Defendant Edward Lee Childress respectfully requests that the Court separate his trial from the trial of his co-Defendant Wilson Jones.

Respectfully submitted this the 27th day of October, 2025.

                                          EDWARD LEE CHILDRESS

                                          By:    *s/ Sidney E. Lampton*
                                                         SIDNEY E. LAMPTON

OF COUNSEL:

Mark D. Jicka (MSB No. 8969)
J. Scott Gilbert (MSB No. 102123)
Sidney E. Lampton (MSB No. 105957)
WATKINS & EAGER PLLC
P. O. Box 650
Jackson, MS 39205-0650
Telephone: 601-965-1900
Facsimile: 601-965-1901
mjicka@watkinseager.com
sgilbert@watkinseager.com
slampton@watkinseager.com